[No. S014557. Oct. 26, 1992.]

CHARLES PATRICK WOOSLEY, Plaintiff and Appellant, v.
THE STATE OF CALIFORNIA et al., Defendants and Appellants.

## COUNSEL

Charles Patrick Woosley, in pro. per., Donald C. Turpen, Gansinger, Hinshaw, Buckley & Schauer, Gansinger, Hinshaw & Buckley, James M. Gansinger, Busetti & Rolin, Busetti & Feinstein, John F. Busetti and Janice L. Feinstein for Plaintiff and Appellant.

Frear Stephen Schmid as Amicus Curiae on behalf of Plaintiff and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Timothy G. Laddish, Assistant Attorney General, Edmond B. Mamer, Philip C. Griffin and Richard E. Nielsen, Deputy Attorneys General, for Defendants and Appellants.

McDonough, Holland & Allen, Robert R. Rubin and Mark A. Wasser as Amici Curiae on behalf of Defendants and Appellants.

## OPINION

GEORGE, J.—This is a class action challenging the practice of the State of California, acting through the Department of Motor Vehicles (DMV) and the State Board of Equalization (SBE), of charging annual vehicle license fees and use taxes on passenger vehicles[1] originally sold outside California that were higher than the fees and taxes charged on similar vehicles first sold within the state.[2] Also at issue is whether the DMV complied with the provisions of the California Administrative Procedure Act (Gov. Code, § 11340 et seq.) when, in November 1976, it altered its practice regarding

---

[1]Vehicle Code section 465 defines "passenger vehicle" as "any motor vehicle, other than a motortruck or truck tractor, designed for carrying not more than 10 persons including the driver, and used or maintained for the transportation of persons. The term 'passenger vehicle' shall include a housecar."

The term "vehicle" is used in this opinion to refer to "passenger vehicle" unless otherwise noted.

[2]As explained below, the state has abandoned the practice challenged here due, in part, to several statutory amendments, but the state's former practice continues to affect the vehicle license fees charged in some instances.

the collection of use taxes for all vehicles, whether originally purchased in California or elsewhere. Finally, we decide whether the class claim filed in this case was authorized by statute. The state estimates that the current amount of the refund of vehicle license fees and use taxes due under the judgment appealed from exceeds $1 billion.

For the reasons that follow, we hold the state violated the commerce clause of the United States Constitution by imposing vehicle license fees and use taxes on vehicles originally sold outside California that were higher than the fees and taxes charged on similar vehicles first sold within the state. We also hold that even if the DMV failed to comply with the procedural requirements of the California Administrative Procedure Act when it altered its practice regarding collection of use taxes, the state cannot be required on that basis to refund taxes which properly were due under state law.

Lastly, we hold the class claim filed in this case was not authorized by statute. That claim is valid only as to Woosley in his individual capacity. Although our ruling does not automatically preclude continuation of this suit as a class action, the class may include only persons who timely filed valid claims for refunds. Our holding will necessitate that the trial court, upon remand, redetermine whether an ascertainable class exists for purposes of a class action. Because the composition of the class is uncertain at this time, and because the issues raised by the parties have been fully litigated and are of substantial public importance, we proceed to address the issues which prompted our grant of review.

### Procedural and Factual History

On February 23, 1976, plaintiff Charles Patrick Woosley, a California resident, purchased a 1936 Auburn supercharged, two-door speedster for $25,000 from a private party in North Carolina, and on November 12, 1976, he attempted to register the vehicle in California. Had Woosley purchased from a private party an identical automobile that originally had been sold in California, he would have been charged a vehicle-license fee[3] of $2 and a

---

[3]Revenue and Taxation Code section 10751 states: "A license fee is hereby imposed for the privilege of operating upon the public highways in this state any vehicle of a type which is subject to registration under the Vehicle Code . . . ." Vehicle Code section 4000, subdivision (a)(1), requires registration of "any motor vehicle, trailer, semitrailer, pole or pipe dolly, logging dolly, or auxiliary dolly . . . ."

use tax[4] of $6 by the DMV. Because he purchased a vehicle that originally had been sold outside the state, however, the DMV used different methods of calculation, as explained below, and charged Woosley a license fee of $427 and a use tax of $1,500.[5]

After filing claims for refunds on behalf of himself and all others similarly situated and pursuing administrative remedies, without success, on July 20, 1978, Woosley filed a class action against the State of California, and several state agencies, including the DMV and the SBE, for a refund of license fees and use taxes, and for injunctive relief. By stipulation of the parties, the liability issues were bifurcated from the issues involving certification of the class, and the liability issues were tried first.

On December 27, 1983, following trial to the court, the court rendered its statement of decision on the issue of liability, and on November 13, 1984, rendered its statement of decision on the issues relating to class certification. On July 1, 1985, the court entered judgment in favor of plaintiff. After appeal by the state, the Court of Appeal affirmed the judgment. We granted the state's petition for review. Because neither party disputes the accuracy of the trial court's statements of decision, we accept the factual findings contained therein.

*Vehicle License Fees*

An annual license fee is "imposed for the privilege of operating [a vehicle] upon the public highways in this state . . . ." (Rev. & Tax. Code, § 10751.)[6] The amount of this fee "shall be a sum equal to 2 percent of the market value of the vehicle as determined by the [DMV]." (§ 10752.)

As originally enacted in 1941, section 10753 directed the DMV annually to "compile and publish a list showing the market values . . . of each class

---

[4]Revenue and Taxation Code section 6201 states, in pertinent part: "An excise tax is hereby imposed on the storage, use, or other consumption in this state of tangible personal property purchased from any retailer . . . ."

[5]These differences in the fee and the tax are particularly large in Woosley's case because both the fee and the tax were based on the purchase price of the vehicle. As explained below, had Woosley purchased the vehicle in California, the formula which would have been used to determine the fee and the tax would not have been based on the purchase price and, therefore, would not have reflected the value of the automobile as an antique.

Woosley could have registered his automobile as an "historic" vehicle and paid a lower vehicle license fee. (Rev. & Tax. Code, § 10753.5.) Woosley points out, however, that a vehicle so designated has a limited use, because it must be "operated by a collector or hobbyist principally for purposes of exhibition and historic vehicle club activities." (Veh. Code, § 5004, subd. (f).)

[6]All further statutory references are to the Revenue and Taxation Code unless otherwise indicated.

of vehicle subject to the license fee . . . ." (Stats. 1941, ch. 40, § 1, pp. 605-606.) Upon registration, the DMV would use the information in this "rate book" to assign to the vehicle a classification code from which its market value would be determined for the year of the sale and all subsequent years, regardless of any change in ownership. The DMV did not differentiate between vehicles originally sold within California and those originally sold outside the state.

In 1948, section 10753 was amended to require the DMV to determine the market value of vehicles "upon the basis of the California delivered prices as established by the manufacturers or distributors in their selling agreements with authorized dealers as of the time the particular make and year model is first offered for sale in California . . . ." (Stats. 1948, ch. 26, § 2, p. 129.) Manufacturers informed the DMV of the "delivered price" on each model, and the DMV entered this information in its rate book. Using a method described in section 10753.2 (enacted in 1948), the market value of each vehicle was determined from this "delivered price" according to a depreciation schedule set forth in the statute.[7] As before, the same classification code was assigned to the vehicle and the same tax was imposed, whether the vehicle was purchased in California or elsewhere.

The DMV, however, urged the Legislature to alter the method for determining the vehicle license fee, because manufacturers objected to supplying information regarding prices, thereby causing delays at the beginning of each model year in updating the rate book. In 1967, the Legislature amended section 10753 to require the DMV to determine the market value of vehicles by reference to "the California suggested base price" (§ 10753, subd. (a)), which was defined as "the retail price of the vehicle suggested by the manufacturer . . . as reflected on the price listing affixed to the vehicle pursuant to the Federal Automobile Information Disclosure Act of 1958 . . . ." (§ 10753, subd. (g), as amended by Stats. 1967, ch. 435, § 1, pp. 1647-1648.) The "price listing" is commonly referred to as the "sticker price" of the vehicle.[8] Section 10753 defined the California suggested base price to include "destination charge[s]" and the cost of statutorily required

---

[7]Under section 10753.2 as originally enacted, the vehicle would be classified according to its "California delivered price" into one of a "series of classes successively set up in brackets having a spread of two hundred dollars . . . ." (Stats. 1948, ch. 26, § 3, p. 130.) The market value of the vehicle was defined as a stated percentage "of a sum equal to the middle point between the extremes of its class . . . ." (*Ibid.*) This percentage, which was set forth in a depreciation schedule, began at 85 percent "the year [the vehicle was] first sold to a consumer as a new vehicle" and decreased over time to a minimum of 5 percent. (*Ibid.*) The depreciation schedule has since been amended, most recently in 1991. (Stats. 1991, ch. 87, §§ 3, 4.)

[8]This amendment applied solely to passenger vehicles.

"emission control devices," but not the cost of factory-installed "accessor[ies]" or "optional equipment."[9] (§ 10753, subd. (g).) The statute further provided: "In the event the [DMV] is unable to ascertain the California suggested base price as herein defined . . . , the [DMV] shall determine the market value upon the basis of the cost price to the purchaser of the vehicle as evidenced by a certificate of cost . . . ." (§ 10753, subd. (c).)

Consistently, the Legislature also amended section 10753.2, which, as described above, sets forth the depreciation schedule used in determining a vehicle's market value, to reflect that this process was based on "the California suggested base price, as defined above, of a vehicle or its cost price to the purchaser . . . ." (Stats. 1967, ch. 435, § 2, p. 1649.)

Based upon these amendments, the DMV ceased producing a rate book and began requiring dealers to provide, for each new vehicle sold in California, a "report of sale" listing the manufacturer's suggested retail price, destination charge, and the cost of emission-control devices as reflected by the "sticker" on the vehicle. As before, the DMV would use the information supplied by the dealer to assign to the vehicle a classification code from which its market value would be determined for the year of the sale and all subsequent years.

If a vehicle originally was sold in another state, however, the DMV would not receive a "report of sale" from the dealer and thus could not assign a classification code. When the owner of such a vehicle attempted to register it in California, the DMV took the position that the "California suggested base price" could not be ascertained, and the DMV instead determined the market value of the vehicle based upon the "cost price to the purchaser," requiring the owner to produce a certificate of cost. The DMV required a certificate of cost in such circumstances even if, as to pre-1968 models, the vehicle was listed in the DMV rate-book or the original sticker price was available. This practice resulted in the imposition of significantly higher license fees for vehicles purchased outside the state than for those first sold in California, in part because the cost of factory-installed accessories and optional equipment was excluded from the suggested base price for vehicles originally purchased in California, but not from the actual cost of vehicles first purchased in other states.

The DMV's adoption of methods for determining the market value of vehicles originally purchased in California which differed from the methods applied to vehicles first sold elsewhere led the DMV also to adopt different

---

[9]The DMV included the cost of accessories and optional equipment installed by the dealer. We need not, and do not, decide whether this was a correct interpretation of section 10753.

methods of applying the depreciation schedule in section 10753.2. For vehicles originally purchased in California, the DMV used the vehicle's sticker price to determine its market value and applied the depreciation schedule, as directed by section 10753.2, subdivision (c), "starting with the year [the vehicle was] first sold to a consumer as a new vehicle, . . ." (Stats. 1948, ch. 26, § 3, p. 130.)

For vehicles originally purchased outside the state, however, the market value of the vehicle was based upon its actual cost to the person registering the vehicle rather than upon its sticker price. Presumably because the person registering the vehicle might have purchased it new or, instead, in a subsequent year as a used vehicle, the DMV interpreted the "first year" of the depreciation schedule to be the year the vehicle was sold to the first person to register the vehicle in California.[10] Apparently, the DMV adopted this approach because the actual cost of a used vehicle already would reflect the depreciated value of the vehicle. The DMV's application of the depreciation schedule to vehicles purchased outside the state, however, directly conflicted with the clear command of the then-governing language of section 10753.2, subdivision (c), that the "first year" of the depreciation schedule be "the year [the vehicle was] first sold to a consumer as a new vehicle." (Stats. 1948, ch. 26, § 3, p. 130.)

In 1977, the Legislature amended section 10753.2, subdivision (c), to provide that the depreciation schedule could be applied starting "with either the year the vehicle was first sold to a consumer as a new vehicle or the year the vehicle was first purchased or assembled by the person applying for original registration in this state." (Stats. 1977, ch. 821, § 1, p. 2491.) This amendment provided statutory authorization for the DMV's already well-established practice of treating as the "first year" of the depreciation schedule the year a vehicle was purchased outside the state by the person applying for registration.

In 1983, while the present litigation was pending, section 10753, subdivision (a), was amended to require the DMV to base the market value of all

---

[10]For example, an automobile sold new in California two years ago and having a sticker price of $10,000 would be considered in its "third year" of the depreciation schedule and would be assigned a market value of 70 percent of $10,000, or $7,000. If instead this vehicle originally had been sold outside California and was resold two years later for $8,500 to a person who registered it in California, the DMV would consider the vehicle to be in its "first year" of the depreciation schedule and would assign it a market value of 85 percent of $8,500, or $7,225. It is apparent from the foregoing example that whether this method of applying the depreciation schedule will penalize or benefit the purchaser of an out-of-state vehicle depends upon the purchase price. In the example, lowering the purchase price of the two-year-old, out-of-state vehicle to $8,000 would produce a market value of $6,800.

vehicles "on the basis of the cost price to the purchaser as evidenced by a certificate of cost . . . ." (Stats. 1983, ch. 323, § 79.1, p. 1017.) Effective June 30, 1991, the statute again was amended to require the DMV to redetermine the market value of a vehicle, based on its actual cost, upon its sale as a used vehicle. (§ 10753, subd. (a).) For vehicles first registered in 1983 or later, therefore, the market value is based upon the actual cost of the vehicle, whether or not it was purchased in California. For a vehicle first registered before 1983 and not sold as a used vehicle after June 30, 1991, however, the method used by the DMV to determine the market value of the vehicle depends upon where the vehicle originally was purchased.

The reference to the "California suggested base price" also was deleted from section 10753.2, subdivision (a), by the 1983 legislation. Because of the 1977 amendment discussed above, however, section 10753.2, subdivision (c), continued to permit the DMV to treat the "first year" of the depreciation schedule either as "the year the vehicle was first sold to a consumer as a new vehicle or the year the vehicle was first purchased or assembled by the person applying for original registration in this state . . . ." (Stats. 1977, ch. 821, § 1, p. 2491.)[11]

*Use Taxes*

■ The use tax (§ 6201 et seq.) complements the sales tax (§ 6051 et seq.). The sales tax "levies a tax upon the gross receipts of California retailers from sales of tangible personal property," while the use tax "imposes an excise on the consumer at the same rate [as the sales tax] for the storage, use or other consumption in the state of such property when purchased from any retailer. As property covered by the sales tax is exempt under the use tax, all tangible personalty sold or utilized in California is taxed once for the support of the state government." (*Southern Pac. Co.* v. *Gallagher* (1939) 306 U.S. 167, 171 [83 L.Ed. 586, 590, 59 S.Ct. 389]; § 6401.) Thus, for example, the use tax is applied to goods purchased from out-of-state retailers (which are not subject to California sales tax), thereby preventing such out-of-state retailers from enjoying an unfair advantage over local retailers.[12] The sale of a vehicle by a private party (i.e., not a licensed dealer) is exempted from the sales tax but is subject to the use tax, unlike the

---

[11]As amended in 1991, section 10753.2, subdivision (c), defines the "first year" of the depreciation schedule as "the year the vehicle was first sold to a consumer as a new vehicle, or the year the vehicle was first purchased or assembled by the person applying for original registration in this state, *or the year the vehicle was sold to the current registered owner as a used vehicle* . . . ." (§ 10753.2, subd. (c), italics added.)

[12]As we explained in *Union Oil Co.* v. *State Bd. of Equal.* (1963) 60 Cal.2d 441, 449 [34 Cal.Rptr. 872, 386 P.2d 496]: "If the California businessman, intending to buy property for use in California, could avoid the sales tax merely by purchasing the product outside the state,

occasional sale of other types of personal property by a private party which is exempt from all tax. (§§ 6282, 6367.)

The DMV collects the use tax on vehicles on behalf of the SBE. (Veh. Code, §§ 4750.5, 38211.) Payment of the use tax must accompany an application to transfer ownership of a vehicle registered in California or to register a vehicle purchased outside the state. (Veh. Code, §§ 38211, 4300.5.)

The use tax, like the sales tax, is based upon a percentage of the sales price of the item (§§ 6012, 6051, 6201) but, until recently, where use tax on a vehicle is concerned, former section 6276 declared that "the sales price shall be presumed to be an amount equal to the market value of the vehicle at the time of the purchase *as that value is determined to measure vehicle license fees* . . . ." (Italics added.)[13] This presumption did not apply, however, to vehicles "purchased outside this state from the manufacturer or from a vehicle dealer . . . ." (*Ibid.*) The statute further provided that this presumption "may be rebutted by evidence which establishes that the sales price was other than that amount." (Former § 6276.)

Former section 6276, therefore, established a rebuttable presumption, applicable to the purchase of vehicles from private parties, that the sales price on which the use tax was based was equivalent to the market value used to determine vehicle license fees. The trial court found that from 1967 to November 1976, the DMV utilized this presumption in calculating the use tax due on the sale of vehicles by private parties in California. The DMV would calculate the current market value, as determined for vehicle license fee purposes, using the classification code assigned to the vehicle when it was new, and would base the use tax due on this depreciated market value.

As noted above, however, a vehicle originally purchased outside the state was not assigned such a classification code, because the DMV did not receive a "report of sale" from out-of-state dealers. When an out-of-state vehicle was registered in California, therefore, the market value used to determine the vehicle license fee was based on the actual cost of the vehicle, as shown by a certificate of cost provided by the owner. In such a case, the use tax also was based on the actual cost of the vehicle as shown by a certificate of cost.

---

the local retailer would suffer a severe commercial disadvantage. Hence California imposes an excise tax upon the purchaser of tangible personal property in the event that, having paid no sales tax to California on the purchase, he proposes to and actually does store, use, or otherwise consume such property in this state."

A credit against the use tax is allowed for sales taxes paid to another state with respect to the property. (§ 6406.)

[13]Section 6276 was repealed effective August 1, 1991. (Stats. 1991, ch. 87, § 1.)

Thus, during this period, vehicles purchased from dealers within and outside California were taxed equally. If a vehicle was sold by a dealer in California, a sales tax was assessed based on the sales price. If a vehicle was sold by a dealer outside the state, a use tax based on the sales price was assessed when the owner registered the vehicle in California.

The amount of the use tax imposed on vehicles purchased from private parties, however, depended upon where they were purchased. If a vehicle originally sold in California was purchased as a used vehicle from a private party in California, the DMV used the former section 6276 presumption and would base the use tax on the market value as determined for vehicle license fee purposes. If a vehicle originally sold outside the state was purchased as a used vehicle from a private party in another state, however, the DMV would base the use tax on the actual cost of the vehicle to the person registering the vehicle in California.

Accordingly, the DMV's practice during this period of determining the market value of a vehicle originally sold in California based upon its sticker price but determining the market value of a vehicle originally sold elsewhere based upon its actual cost, resulted not only in higher license fees for out-of-state vehicles, but also in higher use taxes for vehicles purchased in other states from private parties.

In November 1976, after Woosley had purchased and attempted to register his vehicle, the DMV and the SBE concluded lengthy discussions and, relying upon an opinion of the Attorney General (59 Ops.Cal.Atty.Gen. 47 (1976)), agreed that the DMV would begin calculating the use tax on *all* vehicles purchased from private parties on the basis of their actual cost, as shown by a certificate of cost provided by the owner, rather than the depreciated sticker price, as reflected in the classification code assigned to vehicles first sold in California. This change brought to an end the discrepancy which existed in the calculation of the use tax between vehicles purchased from private parties in California and vehicles purchased outside the state, but raised the issue whether this change in practice constituted a regulation, requiring the DMV to comply with the provisions of the Administrative Procedure Act pertaining to the enactment of regulations. (Gov. Code, § 11340 et seq.)

*Lower-court Rulings*

The trial court found that the DMV's employment of a method to compute the vehicle license fees and use taxes due on vehicles originally purchased outside California which differed from the method used for vehicles originally purchased within the state, resulted in the imposition of "significantly

higher" fees and taxes on vehicles purchased outside the state. The court held that this practice violated "applicable state statutes and regulations," as well as the commerce clause of the federal Constitution and the equal protection clauses of the state and federal Constitutions. With regard to vehicle license fees, this practice began in 1967 and continues to the present time as to vehicles first registered before 1983 or sold as used vehicles prior to June 30, 1991, although, as described above, recent legislation has eliminated the different treatment for vehicles sold after June 30, 1991, as used. With regard to use taxes, however, the different treatment ended in November 1976, when the DMV adopted its new policy of basing the use tax as to all vehicles on their actual cost.

The trial court further held that the November 1976 agreement between the SBE and the DMV to begin basing the use tax for all vehicles on their actual cost was invalid, because the agreement was not adopted as a formal regulation in compliance with the requirements of the Administrative Procedure Act. (Gov. Code, § 11340 et seq.)

Subsequently, the trial court resolved the previously bifurcated class-certification issues by certifying two classes. One of these classes consists of "[a]ll persons in the State of California who from within three years prior to October 20, 1977 [when Woosley mailed his initial claim for refund][14] to the date of the refund, were charged and paid more vehicle license fees or use taxes for registration of vehicles previously registered or titled outside of the State of California because those fees or taxes were based on the actual cost of those vehicles rather than on the statutorily presumed price . . . ."[15] The trial court found that approximately 2.8 million persons are included within this class. The other class consists of all persons who, since November 1976, have paid higher use taxes on vehicles because of the DMV's decision to begin basing the calculation of such taxes for all vehicles on the actual cost of the vehicle. The trial court found that approximately 14 million persons are included within this class.

The court awarded $13.7 million to counsel for the class as attorney fees, and $1 million in fees to Woosley, who is an attorney, "for services rendered as class representative," directing that both sums be paid from the common fund recovered. (*Serrano* v. *Priest* (1977) 20 Cal.3d 25, 35 [141 Cal.Rptr. 315, 569 P.2d 1303].)

---

[14]Section 10901 and Vehicle Code sections 42231 and 42232 provide that claims for refunds of vehicle license fees must be filed within three years after the date of the payment.

[15]This class also should include persons who paid higher fees and taxes because the DMV applied the section 10753.2 depreciation schedule to vehicles originally purchased outside California in a manner different from that applied to vehicles originally purchased within the state. It appears the trial court's failure to include such persons in its description of the class was inadvertent.

The state appealed. Woosley in his individual capacity also appealed, contending the trial court erroneously denied him attorney fees for the legal assistance he rendered to the class and compensated him solely "as class representative." The Court of Appeal consolidated the two appeals, affirmed the judgment on the principal appeal, and vacated the award of fees to Woosley, remanding the matter for a hearing as to whether Woosley is entitled to an award of fees for his legal services.

We granted the state's petition for review, specifying that "[t]he issues to be argued before this court shall be limited to those addressed in the published portion of the Court of Appeal opinion." We thereby excluded from consideration by this court the question whether Woosley had exhausted his administrative remedies, as well as a number of other peripheral issues. By subsequent order, we granted Woosley's request to expand the scope of our review to include the issue whether the practices followed by the state violated the equal-protection clauses of the federal and state Constitutions.

### DISCUSSION

*Statutory Interpretation*

The state contends it was authorized by statute to employ methods of computing vehicle-license fees and use taxes for vehicles originally purchased outside California which differed from the methods applied to vehicles originally purchased within the state. The state notes that from 1967 to 1983, section 10753 directed that for purposes of calculating vehicle license fees and use taxes, the market value of vehicles "shall be determined . . . upon the basis of the California suggested base price as herein defined" but further provided that, "[i]n the event the [DMV was] unable to ascertain the California suggested base price . . . , the [DMV] shall determine the market value upon the basis of the cost price to the purchaser . . . ." (Stats. 1967, ch. 435, § 1, pp. 1647-1648.) The state argues that vehicles originally purchased outside California had no "California suggested base price" and, therefore, the statute commanded that the market value of those vehicles be based on their actual cost.

"We begin with the fundamental rule that a court 'should ascertain the intent of the Legislature so as to effectuate the purpose of the law.' [Citation.] In determining such intent '[t]he court turns first to the words themselves for the answer.' [Citation.] We are required to give effect to statutes 'according to the usual, ordinary import of the language employed in framing them.' [Citations.] 'If possible, significance should be given to

every word, phrase, sentence and part of an act in pursuance of the legislative purpose.' [Citation.] '[A] construction making some words surplusage is to be avoided.' [Citation.]" (*Moyer* v. *Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230 [110 Cal.Rptr. 144, 514 P.2d 1224].)

 The words used by the Legislature suggest that only vehicles originally sold in California had a "California suggested base price"; otherwise the word "California" would be mere surplusage.

Plaintiff points out that the pre-1967 version of section 10753 used the word "California" in a similar fashion in the phrase "California delivered price," but the DMV had treated all vehicles alike regardless of where they originally were purchased. This circumstance is significant but not dispositive. The exact meaning of the phrase "California delivered price," as used in the former version of section 10753, is unclear, because the Legislature had provided that this term would be "defined . . . by the manufacturers." The 1967 amendment, however, expressly defined the new term "California suggested base price" to include the cost of "emission control devices as are required by Section 24390 [now 39129] of the Health and Safety Code, . . ." (Stats. 1967, ch. 435, § 1, p. 1648.) The cost of such emission-control devices would appear only on the stickers of vehicles sold new in California.

 In addition, the administrative construction of section 10753 adopted by the DMV immediately after the 1967 amendment of the statute, while "not necessarily controlling, . . . 'is entitled to great weight, and courts generally will not depart from such construction unless it is clearly erroneous or unauthorized.' [Citations.]" (*Select Base Materials* v. *Board of Equal.* (1959) 51 Cal.2d 640, 647 [335 P.2d 672].)

Finally, in 1977, the Legislature endorsed this administrative construction by amending section 10753.2 to authorize the DMV to apply the depreciation schedule beginning with the year the vehicle was purchased by the person seeking to register the vehicle. Despite the prior lack of statutory authorization, the DMV, since the 1967 amendments to sections 10753 and 10753.2, had been applying the depreciation schedule in this fashion to vehicles originally purchased outside the state. As explained above, the DMV adopted this approach as a direct consequence of its conclusion that only California vehicles had a "California suggested base price," and its resulting practice of basing the market value of vehicles purchased in other states upon their actual cost. By amending section 10753.2 to authorize the DMV's application of the depreciation schedule, the Legislature endorsed the DMV's administrative construction of section 10753, from which the DMV's application of the depreciation schedule had resulted.

Accordingly, we conclude that the DMV's practice of imposing vehicle license fees and use taxes on vehicles originally purchased in California, different from the fees and taxes imposed upon similar vehicles originally purchased outside the state, was statutorily authorized. Thus, we proceed to consider whether this practice placed a disproportionate burden on interstate commerce in violation of the commerce clause of the federal Constitution.

### Commerce Clause

"Article I, § 8, cl. 3 of the [United States] Constitution expressly authorizes Congress to 'regulate Commerce with foreign Nations, and among the several States.' It says nothing about the protection of interstate commerce in the absence of any action by Congress. Nevertheless, . . . the Commerce Clause is more than an affirmative grant of power; it has a negative sweep as well. The clause . . . 'by its own force' prohibits certain state actions that interfere with interstate commerce. [Citation.]" (*Quill Corp. v. North Dakota* (1992) 504 U.S. __, __ [119 L.Ed.2d 91, 104, 112 S.Ct. 1904].) The high court has held that a state tax that affects interstate commerce does not violate this "negative" or "dormant" commerce clause if "the tax is applied to an activity with a substantial nexus with the taxing State,'is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State." (*Complete Auto Transit, Inc.* v. *Brady* (1977) 430 U.S. 274, 279 [51 L.Ed.2d 326, 331, 97 S.Ct. 1076] [hereafter *Complete Auto Transit*]; accord, *Goldberg* v. *Sweet* (1989) 488 U.S. 252, 259-260 [102 L.Ed.2d 607, 615-616, 109 S.Ct. 582].)

The issue here relates to the third element of the *Complete Auto Transit* test—whether the tax discriminates against interstate commerce. Such discrimination may arise in several guises, and "a tax may violate the Commerce Clause if it is facially discriminatory, has a discriminatory intent, or has the effect of unduly burdening interstate commerce." (*Amerada Hess Corp.* v. *N. J. Taxation Div.* (1989) 490 U.S. 66, 75 [104 L.Ed.2d 58, 68, 109 S.Ct. 1617].)

As numerous cases have established, a tax which is imposed at a uniform rate on interstate and intrastate commerce still may be facially discriminatory if state law defines the tax base differently for interstate transactions, with the result that they incur a higher tax than that imposed on intrastate transactions. For example, in *Halliburton Oil Well Co.* v. *Reily* (1963) 373 U.S. 64 [10 L.Ed.2d 202, 83 S.Ct. 1201], Louisiana imposed sales and use taxes at a uniform rate upon property purchased within and without the state, respectively. Nevertheless, the use tax was held unconstitutional as applied to trucks the taxpayer had assembled outside the state and brought into

Louisiana, because the state had included in the trucks' taxable value the cost of labor and shop overhead attributable to assembling the units, costs which would not have been included had the trucks been assembled within the state.

In *Tyler Pipe Industries* v. *Dept. of Revenue* (1987) 483 U.S. 232, 248 [97 L.Ed.2d 199, 214, 107 S.Ct. 2810], the court invalidated a Washington tax on manufacturing because the law favored local manufacturers who sold their products within the state, by granting them a partial exemption from the manufacturing tax unavailable to local manufacturers who sold their products outside the state and unavailable to out-of-state manufacturers who sold their products in Washington.

In *New Energy Co. of Indiana* v. *Limbach* (1988) 486 U.S. 269 [100 L.Ed.2d 302, 108 S.Ct. 1803], the court invalidated a provision of the Ohio "motor vehicle fuel sales tax" which awarded a tax credit for sales of ethanol produced in Ohio or in a state that grants similar tax advantages to ethanol produced in Ohio, but not for sales of ethanol produced in other states.

And in *Matthews* v. *State, Dept. of Revenue* (1977) 193 Colo. 44 [562 P.2d 415], the Colorado Supreme Court invalidated a tax system which authorized a trade-in allowance when computing the sales tax due on a vehicle purchased in Colorado, but allowed no such deduction when computing the use tax due on a vehicle purchased outside the state. In each of these cases, taxes were imposed at a uniform rate, but the state discriminated against interstate transactions in defining the base upon which such taxes were levied.

In the present case, the DMV employed two different methods of defining market value for purposes of computing both vehicle license fees and use taxes: if the vehicle originally was purchased in California, the market value was the depreciated sticker price, excluding the cost of optional equipment; if originally purchased elsewhere, it was the actual purchase price. The discrimination between interstate and local commerce is plain. In cases, such as Woosley's, in which this discrimination resulted in the imposition of higher fees and taxes on vehicles purchased outside the state (a situation which the trial court generally found to be the case), the violation of the commerce clause is patent.

The state, contending the foregoing authority is not controlling, instead argues that language in the decision in *Goldberg* v. *Sweet, supra*, 488 U.S. 252, mandates the conclusion that the DMV's methods of collecting vehicle-license fees and use taxes did not offend the commerce clause. In *Goldberg*, Illinois had imposed a 5 percent tax on all interstate telecommunications

which originated or terminated in the state and which were charged to an Illinois service address. An identical 5 percent tax was imposed on intrastate telecommunications. In a class action, Illinois residents claimed the tax on interstate telecommunications violated the commerce clause.

The court in *Goldberg* v. *Sweet, supra,* 488 U.S. 252, applying the four-part *Complete Auto Transit* test, upheld the tax. In holding, under the third prong of that test, that the taxes did not discriminate against interstate commerce "by allocating a larger share of the tax burden to interstate telephone calls," the court distinguished *American Trucking Assns., Inc.* v. *Scheiner* (1987) 483 U.S. 266 [97 L.Ed.2d 226, 107 S.Ct. 2829]. "In *Scheiner*," it said, "we held that Pennsylvania's flat taxes on the operation of all trucks on Pennsylvania highways imposed a disproportionate burden on interstate trucks, as compared with intrastate trucks, because the interstate trucks traveled fewer miles per year on Pennsylvania highways. [Citation.] The Illinois tax differs from the flat taxes found discriminatory in *Scheiner* . . . . [W]hereas Pennsylvania's flat taxes burdened out-of-state truckers who would have difficulty effecting legislative change, the economic burden of the Illinois telecommunications tax falls on the Illinois telecommunications consumer, the insider who presumably is able to complain about and change the tax through the Illinois political process. *It is not a purpose of the Commerce Clause to protect state residents from their own state taxes.*" (*Goldberg* v. *Sweet, supra,* 488 U.S. at p. 266 [102 L.Ed.2d at p. 620], italics added.)

The state contends the emphasized language in the quoted passage is conclusive. It reads that language as holding unequivocally that so long as a state imposes a tax only on its residents, the commerce clause permits it to discriminate against those residents who engage in interstate transactions. Although the taxes at issue in *Goldberg* were imposed only on residents of the taxing state, this circumstance was not regarded by the high court as conclusive. Rather, it treated this as one factor to be considered in deciding whether the taxes offended the commerce clause. The court went on to discuss another factor before concluding that the taxes did not discriminate in favor of intrastate commerce, and discussed the three remaining prongs of the test set forth in *Complete Auto Transit* before holding that the taxes did not violate the commerce clause.

Nowhere in the decision in *Goldberg* v. *Sweet, supra,* 488 U.S. 252, does the court declare that taxes imposed on residents of the taxing state never can offend the commerce clause. What the high court does say is that "[i]t is not a purpose of the Commerce Clause to protect state residents from their own state taxes." (*Id.* at p. 266 [102 L.Ed.2d at p. 620].) This is hardly a

remarkable proposition. ■■■ The purpose of the commerce clause is to protect interstate commerce by " 'creat[ing] an area of trade free from interference by the States.' [Citations.]" (*American Trucking Assns., Inc.* v. *Scheiner, supra*, 483 U.S. 266, 280 [97 L.Ed.2d 226, 241].) The commerce clause is not designed to protect taxpayers of the taxing state, but to protect interstate commerce.

■■■ We must determine whether, by stating this obvious proposition, the high court meant to suggest that a tax never can offend the commerce clause so long as it is levied on residents of the taxing state. Such a ruling would be inconsistent with a long line of prior decisions rendered by the United States Supreme Court.

That court has, on numerous occasions, invalidated taxes imposed by states upon their own residents where those taxes placed an undue burden on interstate commerce. Such decisions include, for example, *Tyler Pipe Industries* v. *Dept. of Revenue, supra*, 483 U.S. 232, discussed above; *Bacchus Imports, Ltd.* v. *Dias* (1984) 468 U.S. 263 [82 L.Ed.2d 200, 104 S.Ct. 3049], which invalidated a liquor tax imposed on local wholesalers, because it exempted locally produced beverages; *Evco* v. *Jones* (1972) 409 U.S. 91, 93 [34 L.Ed.2d 325, 328-329, 93 S.Ct. 349], which invalidated an unapportioned tax on the gross receipts from sales of personal property by local companies to out-of-state customers; and *Greyhound Lines* v. *Mealey* (1948) 334 U.S. 653, 662-663 [92 L.Ed. 1633, 1641-1642 68 S.Ct. 1260], which invalidated an unapportioned tax on the gross receipts from interstate transportation levied on local carriers.

■■■ The interpretation of *Goldberg* v. *Sweet, supra*, 488 U.S. 252, urged by the state also would be inconsistent with well-established and unquestioned principles of commerce-clause jurisprudence, such as the rule that a use tax on out-of-state purchases is valid only if it imposes a burden no greater than the sales tax imposed on local purchases (*Henneford* v. *Silas Mason Co.* (1937) 300 U.S. 577, 584 [81 L.Ed. 814, 819-820, 57 S.Ct. 524]) and the rule that a state may not levy an income tax which taxes value earned outside its borders (*Container Corp.* v. *Franchise Tax Bd.* (1983) 463 U.S. 159, 164 [77 L.Ed.2d 545, 552, 103 S.Ct. 2933]).

Subsequent to the decision in *Goldberg* v. *Sweet, supra*, 488 U.S. 252, the high court has continued to rely upon the above cited cases in deciding related issues, with no indication that the decision in *Goldberg* has lessened the value of those cases as precedent. (See, e.g., *McKesson Corp.* v. *Florida Alcohol & Tobacco Div.* (1990) 496 U.S. 18, 46 [110 L.Ed.2d 17, 41-42 110 S.Ct. 2238]; *Amerada Hess Corp.* v. *N. J. Taxation Div., supra*, 490 U.S. at pp. 75-76 [104 L.Ed.2d at pp. 68-69].)

Although the high court has not, since its decision in *Goldberg* v. *Sweet*, addressed a commerce-clause challenge to a tax imposed by a state upon residents of that state, the court recently addressed an analogous issue in *Wyoming* v. *Oklahoma* (1992) 502 U.S. __ [117 L.Ed.2d 1, 112 S.Ct. 789]. In that case, the state action under review was not a tax imposed upon state residents, but a statute, directed solely at state residents, which could be enforced by criminal penalties or injunctive relief. The statute, enacted by the Oklahoma Legislature, required coal-fired electric generating plants producing power for sale in Oklahoma to burn a mixture of coal containing at least 10 percent Oklahoma-mined coal. The high court held the statute was unconstitutional under the commerce clause. No mention was made of the decision in *Goldberg* v. *Sweet*.

The holding in *Wyoming* v. *Oklahoma* is incompatible with the interpretation of the decision in *Goldberg* v. *Sweet* urged by the state in the appeal before us. The statute invalidated in *Wyoming* v. *Oklahoma* was directed solely at residents of Oklahoma. The effect of the statute, however, was to place a burden on interstate commerce. Obviously, the circumstance that Oklahoma chose to favor the purchase of locally mined coal by passing a statute enforceable by criminal penalties and injunctive relief, rather than by imposing a tax, does not distinguish the decision in *Wyoming* v. *Oklahoma* from the decision in *Goldberg* v. *Sweet*. The decision in *Wyoming* v. *Oklahoma*, therefore, confirms that the state's interpretation of *Goldberg* v. *Sweet* is incorrect.

■ We conclude that the language in *Goldberg* v. *Sweet*, *supra*, 488 U.S. 252, relied upon by the state, does not support the state's contention. The high court merely acknowledged that the circumstance that a disputed tax is levied upon residents of the taxing state, who are able to challenge the tax through political means, is one factor to be considered in determining whether the tax offends the commerce clause. This factor, however, is not dispositive. The high court did not uphold the telecommunications taxes in *Goldberg* on the sole basis that they were imposed only upon residents of the taxing state, but did so because the taxes did not place a disproportionate burden on interstate commerce. ■ Contrary to the state's position, nothing in the decision in *Goldberg* alters the settled rule that a tax which is levied upon residents of the taxing state and imposes an undue burden on interstate commerce offends the commerce clause.

■ In the present case, the state discriminated against interstate commerce by imposing higher license fees on out-of-state vehicles and by imposing higher use taxes on vehicles purchased from private parties in other states. The circumstance that these fees and taxes were imposed upon

residents of California is a factor to be considered, but is not sufficient, standing alone, to overcome this patent discrimination. Rather, such unequal treatment of interstate and intrastate transactions violates the commerce clause "unless the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism [citation]." (*New Energy Co. of Indiana* v. *Limbach, supra,* 486 U.S. 269, 274 [100 L.Ed.2d at p. 308].)

"[T]he standards for such justification are high." (*New Energy Co. of Indiana* v. *Limbach, supra,* 486 U.S. 269, 278 [100 L.Ed.2d at p. 312].) For example, a state's legitimate need "to protect the health and safety of its citizens and the integrity of its natural resources" has been held, in the absence of a reasonable, nondiscriminatory alternative, to justify an obstruction to interstate commerce. (*Maine* v. *Taylor* (1986) 477 U.S. 131, 151 [91 L.Ed.2d 110, 129, 106 S.Ct. 2440].) The high court has noted, however, that "facial discrimination by itself may be a fatal defect" and that "[a]t a minimum such facial discrimination invokes the strictest scrutiny of any purported legitimate local purpose and of the absence of nondiscriminatory alternatives." (*Hughes* v. *Oklahoma* (1979) 441 U.S. 322, 337 [60 L.Ed.2d 250, 262, 99 S.Ct. 1727].)

The only justification suggested by the state for the discrimination that exists in the present case is administrative convenience. Assuming, without deciding, that such a concern could, under some circumstances, justify an obstruction to interstate commerce, the showing made by the state in this case is insufficient to meet the high standards described in the foregoing decisions.

With respect to vehicle license fees, the state contends it would have been difficult, if not impossible, to determine a California sticker price for vehicles originally sold in other states. Assuming this is true, a state may not adopt a method of imposing a tax that on its face applies only to vehicles originally sold within the state, and then seek to justify the ensuing discrimination against interstate commerce on the basis of the administrative difficulties involved in applying this facially discriminatory method to vehicles first sold elsewhere. The state could have utilized a method of imposing vehicle license fees which was applicable regardless where the vehicle first had been sold. Such a system was in fact utilized prior to the adoption of the discriminatory practice in question, although the DMV found this rate-book system unworkable. A different, but equally nondiscriminatory, procedure currently is in place. We do not suggest the state was required to use either of these systems, but their existence makes it difficult for the state, in justification of its facial discrimination against interstate transactions, to demonstrate "the absence of nondiscriminatory alternatives." (*Hughes* v. *Oklahoma, supra,* 441 U.S. 322, 337 [60 L.Ed.2d 250, 262].)

With respect to the use tax, we are unpersuaded by the state's assertion that it would have been administratively burdensome to base the tax for vehicles sold within California on their actual cost rather than on their presumed market value. The state long has based the tax applicable to vehicles sold outside the state on their actual cost. Any additional burden on the state, caused by also basing the use tax for vehicles purchased in California on the actual cost of the vehicle, was insufficient to deter the DMV from adopting this practice in 1976 at the urging of the SBE, and to deter the Legislature from repealing the section 6276 presumption in 1991. Therefore, the justifications asserted by the state for imposing higher vehicle license fees and use taxes on out-of-state vehicles are inadequate to withstand the heightened scrutiny required of practices which discriminate against interstate commerce.

We conclude that the state's practice of imposing vehicle license fees on vehicles originally purchased outside California which were generally higher than those imposed upon similar vehicles originally purchased within the state, and of imposing use taxes on vehicles purchased from private parties outside California which were generally higher than those imposed upon similar vehicles purchased from private parties within the state, violated the commerce clause of the federal Constitution.[16] Members of the class who paid license fees on vehicles originally purchased outside California, or use taxes on vehicles purchased from private parties outside California, which were higher than the license fees or use taxes that would have been required had those vehicles originally been purchased within the state, are entitled to refunds.

*Administrative Procedure Act*

■ The trial court and the Court of Appeal held that the November 1976 agreement between the SBE and the DMV to begin collecting use taxes for all vehicles on the basis of actual cost was "procedurally defective" because it was not adopted as a formal regulation in compliance with the requirements of the Administrative Procedure Act (APA). (Gov. Code, § 11340 et seq.) Assuming, arguendo, this is true, we conclude no refund of use taxes is required, because the amount of the use taxes collected was due the state under applicable tax statutes.

As explained previously, former section 6276 provided that, in calculating the use tax applicable to a vehicle, its sales price was presumed equal to the market value as determined in calculating the vehicle license fee. That

---

[16]In light of our holding, we need not and do not reach the issue whether the state's practices violate the equal-protection clauses of the federal and state Constitutions.

statute further provided that the foregoing presumption could "be rebutted by evidence which establishes that the sales price was other than [that] amount." (Former § 6276, repealed by Stats. 1991, ch 87, § 1.) Prior to November 1976, the DMV relied upon this presumption in collecting use taxes on vehicles purchased from private parties within California but, for vehicles purchased outside the state, based its calculation on the actual cost of the vehicle.[17]

In 1976, the DMV entered into an interagency agreement with the SBE, effective November 15, 1976, which provided that in *all* private-party transactions, both in-state and out-of-state, the DMV would require a certificate of cost to establish the actual sales price of the vehicle.[18]

The courts below held that this agreement constituted a regulation as defined in the APA.[19] The APA provides that the adoption, amendment, or repeal of any administrative regulation must comply with certain basic, minimum procedural guidelines. (Gov. Code, § 11346.) Among other things, the APA provides for adequate notice to interested persons of the proposed action. (Gov. Code, § 11346.4.) It also provides for a public hearing or an opportunity for interested persons to present contentions in writing, before any state agency may adopt, amend, or repeal any regulation. (Gov. Code, § 11346.8.) In the present case, the state admits that the DMV and the SBE entered into and implemented the agreement without complying with the notice and hearing requirements of that act.

Relying upon the decision in *Market St. Ry. Co.* v. *Cal. St. Bd. Equal.* (1955) 137 Cal.App.2d 87 [290 P.2d 20] [hereafter, *Market St.*], however, the

[17]As noted previously, vehicles purchased from licensed dealers in California were subject to sales tax based upon the actual cost of the vehicle. As also noted above, the presumption set forth in former section 6276 did not apply to vehicles purchased outside the state from licensed dealers. When such a vehicle was registered in California, a use tax was imposed based on the actual cost of the vehicle to the person seeking registration. Thus, vehicles purchased from dealers were taxed equally regardless where they were purchased.

[18]The agreement states: "The Department shall compute the use tax on a vehicle required to be registered . . . measured by the sales price of the vehicle. In the absence of a bill of sale or other documented evidence of the sales price, the sales price of a vehicle required to be registered shall be determined from a Certificate of Cost signed by the purchaser of the vehicle." The DMV issued a memorandum informing all field-office managers of the interagency agreement, and directing that "[w]hen a motorist has purchased a vehicle from a private party and applies for a transfer of ownership, he will be required to complete a Certification of Purchase Price or present an acceptable bill of sale."

[19]Government Code section 11342, subdivision (b), states in pertinent part: " 'Regulation' means every rule, regulation, order, or standard of general application or the amendment, supplement or revision of any such rule, regulation, order or standard adopted by any state agency to implement, interpret, or make specific the law enforced or administered by it, or to govern its procedure, except one which relates only to the internal management of the state agency."

state contends that even if the DMV and the SBE erroneously failed to comply with the APA, use taxes collected pursuant to the invalid agreement need not be refunded because such taxes properly were due under state law. We agree.

In *Market St.*, the City of San Francisco purchased the Market Street Railway Company. At the time of the sale, an interpretative ruling of the SBE provided that no sales tax was due in connection with the sale of an entire business. Market Street Railway Company was aware of this regulation and relied upon it in concluding it owed no sales tax as a result of the sale of its business to the city. Two days after the sale was completed, the SBE revised its regulation to state that sales tax was due on that portion of the proceeds of the sale of a business that represents the fair retail value of the tangible personal property acquired for use rather than resale.

The Court of Appeal held that the state was not estopped from collecting sales taxes on the sale of the business which properly were due under state law. Noting it was obvious that "a tax administrator should not be permitted by an erroneous ruling to exempt a taxpayer from the obligation to pay taxes" (*Market St., supra,* 137 Cal.App.2d at pp. 100-101), the court relied on " 'the general rule that the government does not lose its revenues because of an erroneous ruling of an administrative official as to the meaning of a tax law.' " (*Id.* at pp. 101-102.)

A similar principle applies here. " 'The duty of the tax officials is to collect taxes imposed by law . . . .' " (*Market St., supra,* 137 Cal.App.2d at p. 102.) The failure of the SBE and the DMV to comply with the requirement of the APA in adopting their agreement regarding collection of use taxes does not exempt taxpayers from the obligation to pay such taxes as are required by state law, and cannot deprive the state of the tax revenues to which it is entitled.[20]

Plaintiff makes no attempt to distinguish the decision in *Market St.* In fact, plaintiff does not contend that the invalidity of the regulation requires the state to refund use taxes collected pursuant to that regulation, but relies instead on the argument that the applicable statutes did not authorize the state to require a certificate of cost in collecting those taxes. Based on an examination of the statutes, we conclude otherwise.

---

[20]In reaching a contrary result, the Court of Appeal relied upon Government Code section 11350, which authorizes an action for declaratory relief to determine the validity of a regulation. This statute, however, is strictly construed in tax cases and may not be used to prevent the state from collecting taxes or, by parity of reasoning, to compel the state to refund taxes. (*Pacific Motor Transport Co.* v. *State Bd. of Equalization* (1972) 28 Cal.App.3d 230, 236 [104 Cal.Rptr. 558].)

With respect to the determination of the use tax, former section 6276 stated that the presumption that the sales price of a vehicle equalled the market value, as determined in calculating the vehicle license fee, could be rebutted "by evidence which establishe[d] that the sales price was other than such amount." The section did not specify which party could rebut the presumption, nor did it suggest that the purchaser should be excused from the obligation to pay the use tax based on the actual sales price, when that figure was available. (§§ 6201 and 6011.) If the Legislature intended something so unusual as a presumption rebuttable by one party and not the other, we believe it would have said so. The conclusion appears clear, therefore, that both the state and the taxpayer were free to rebut the presumption by appropriate contrary evidence.

Plaintiff, however, contends—and the Court of Appeal agreed—that the foregoing interpretation is contrary to the Legislature's intent. Plaintiff points out that in 1971, the Legislature considered and rejected a bill which would have rewritten former section 6276 to require vehicle owners to report the sales price of their vehicle. The use tax would have been based on this reported sales price if it was greater than the market value of the vehicle, as determined in calculating the vehicle license fees. If the reported sales price was less than the market value used to determine license fees, the former rebuttable presumption would have applied unless the owner presented a bill of sale.[21] The Legislature, cognizant of the fact that the statutory presumption was yielding less revenue than would a tax based on actual cost, declined to adopt the above described procedure. Instead, the Legislature amended former section 6276, retaining the rebuttable presumption but

[21]As amended June 4, 1971, Assembly Bill No. 1338 read: "SECTION 1. Section 6276 of the Revenue and Taxation Code is repealed. [¶] SEC. 2. Section 6276 is added to the Revenue and Taxation Code, to read: [¶] 6276. Except when a vehicle is purchased outside this state from the manufacturer or from a vehicle dealer, the Department of Motor Vehicles shall collect the use tax in accordance with this section whenever the purchaser of a vehicle is required to pay the use tax. [¶] (a) The purchaser shall be required to report to the department the sales price of the vehicle to the purchaser, including cash, liability assumed and value of any property traded. If this sales price is greater than the value determined to measure vehicle license fees imposed under Part 5 (commencing with Section 10701) of this division, the sales price reported by the purchaser shall be used as the measure of the use tax. [¶] (b) If the total sales price reported by the purchaser is less than the value determined to measure vehicle license fees and the purchaser presents a bill of sale from the seller evidencing the total sales price, the sales price reported by the purchaser shall be used as the measure of the use tax. [¶] (c) If the total sales price reported by the purchaser is less than the value determined to measure vehicle license fees and the purchaser does not present a bill of sale from the seller evidencing the total sales price, the sales price of the vehicle shall be presumed to be its market value at the time of purchase as that value is determined to measure vehicle license fees imposed under Part 5 (commencing with Section 10701) of this division. The presumption may be rebutted by evidence which establishes that the sales price was other than such market value." (3 Assem. J. (1971) Reg. Sess.) p. 4526.)

providing that if the presumption was utilized, the market value as determined for vehicle license fee purposes would be increased by 20 percent.[22] From these circumstances, plaintiff would infer that the Legislature intended the presumption to govern in a significant number of cases, and was opposed to basing the tax in all cases on actual cost. We disagree.

The Legislature retained not only the presumption equating sales price with the market value used to compute the vehicle license fee, but also the provision that this presumption could be rebutted by evidence establishing that the sales price was other than such amount. The Legislature, thus, left the law unchanged in this regard; sales price was presumed to equal the market value used to determine vehicle license fees, but this presumption could be rebutted either by the vehicle owner or the DMV.

The Legislature's unwillingness to rewrite former section 6276 to *require* the DMV to base use taxes on the actual cost of the vehicle does not necessarily evidence a legislative judgment that the DMV should be *prevented* from doing so if the DMV chose to rebut the presumption contained in former section 6276 with evidence of the actual cost of the vehicle. The Legislature's actions are consistent with an intent to leave the matter within the discretion possessed by the DMV.

Perhaps the Legislature anticipated that the presumption would govern in a significant number of cases, even though subject to rebuttal by either the state or the taxpayer. But if the presumption served only the goal of administrative convenience—and plaintiff suggests no plausible alternative purpose—then the Legislature may well have intended that the DMV have discretion to decide that the most convenient practice was one which required the registrant to present a certificate of cost. The circumstances that this practice would yield the greatest revenue, that it would avoid potentially unconstitutional discrimination between in-state and out-of-state purchases, that it would equalize the tax base for use tax and sales tax,[23] and that the Legislature subsequently repealed the presumption, further support the conclusion that the Legislature did not intend to bar the action taken by the DMV.

---

[22]As amended in 1971, former section 6276 read, in pertinent part: "Except when a vehicle is purchased outside this state from the manufacturer or from a vehicle dealer, whenever the purchaser of a vehicle is required to pay the use tax to the Department of Motor Vehicles, the sales price shall be presumed to be an amount equal to the market value of the vehicle at the time of the purchase as that value is determined to measure vehicle license fees . . . , multiplied by a factor of 1.2 for a noncommercial vehicle, including a passenger vehicle . . . or by a factor of 1.8 for a commercial vehicle . . . . The presumption may be rebutted by evidence which establishes that the sales price was other than such amount." (Stats. 1971, ch. 1741, § 1, pp. 3710-3711.)

[23]As noted above, the sales tax and the use tax are complementary, and generally designed so that a transaction yields the same revenue under each tax. (See *Union Oil Co. v. State Bd. of Equalization, supra,* 60 Cal.2d 441, 447.)

*Validity of the Class Claim*

The state contends this suit improperly was certified as a class action. As explained below, we do not reach this issue because we conclude that the class claim filed by Woosley was not authorized by statute.

This court has held that a class *action* may be employed to seek refunds of sales and use taxes (*Javor* v. *State Board of Equalization* (1974) 12 Cal.3d 790, 797 [117 Cal.Rptr. 305, 527 P.2d 1153]), and has approved the use of class *claims* seeking damages from governmental entities for injuries caused by an act or omission of a public entity or its employee (*City of San Jose* v. *Superior Court* (1974) 12 Cal.3d 447 [115 Cal.Rptr. 797, 525 P.2d 701, 76 A.L.R.3d 1223]). Several decisions of the Court of Appeal have extended the holding in *City of San Jose* to permit the filing of class claims seeking tax refunds, reasoning by analogy to the claims statute construed in *City of San Jose* that the existing tax-refund statutes could and should be interpreted to authorize the filing of class claims. (*Schoderbek* v. *Carlson* (1980) 113 Cal.App.3d 1029, 1033 [170 Cal.Rptr. 400]; *Lattin* v. *Franchise Tax Board* (1977) 75 Cal.App.3d 377, 381 [142 Cal.Rptr. 130]; *Santa Barbara Optical Co.* v. *State Bd. of Equalization* (1975) 47 Cal.App.3d 244, 249 [120 Cal.Rptr. 609]; see also *Javor* v. *State Bd. of Equalization* (1977) 73 Cal.App.3d 939, 948 [141 Cal.Rptr. 226].)

Apparently considering the question to be settled, the state has not raised the issue whether a class claim may be filed seeking refunds of vehicle license fees and use taxes. This court, however, never has considered that issue. Because of the general public importance of the issue, and because we had serious questions concerning the resolution of the matter, we requested supplemental briefing on this issue following oral argument.

 For the reasons that follow, we hold that the class claim filed in the present case was not authorized by the statutes governing claims for refunds of vehicle license fees and use taxes. Accordingly, that claim is valid only as to Woosley in his individual capacity, and the class in the present class action properly may include only persons who timely filed valid claims for refunds.

Plaintiff contends that this court's decision in *City of San Jose* v. *Superior Court, supra,* 12 Cal.3d 447 compels the conclusion that class claims may be employed to seek tax refunds. We disagree.

*City of San Jose* held that a class claim could be filed pursuant to Government Code section 910, which governs claims seeking damages from

governmental entities for injuries caused by an act or omission of the public entity or its employee. Government Code section 910 provides in part: "A claim shall be presented *by the claimant or by a person acting on his or her behalf* and shall show all of the following: [¶] (a) The name and post office address of the claimant . . . ." (Italics added.) In *City of San Jose* this court stated: "We conclude 'claimant,' as used in [Government Code] section 910, must be equated with the class itself and therefore reject the suggested necessity for filing an individual claim for each member of the purported class. To require such detailed information in advance of the complaint would severely restrict the maintenance of appropriate class actions—contrary to recognized policy favoring them. [Citations.] We do not believe the claims statutes were intended to thwart class relief. [Fn.]" (*City of San Jose v. Superior Court, supra,* 12 Cal.3d 447, 457.)

Contrary to the line of Court of Appeal decisions cited above, we conclude, for the reasons that follow, that the holding in *City of San Jose* v. *Superior Court, supra,* 12 Cal.3d 447, should not be extended to include claims for tax refunds.

 The California Constitution expressly provides that actions for tax refunds must be brought in the manner prescribed by the Legislature. Article XIII, section 32, of the California Constitution provides in this regard: "After payment of a tax claimed to be illegal, an action may be maintained to recover the tax paid, with interest, *in such manner as may be provided by the Legislature.*" (Italics added.) This constitutional limitation rests on the premise that strict legislative control over the manner in which tax refunds may be sought is necessary so that governmental entities may engage in fiscal planning based on expected tax revenues. (See *State Bd. of Equalization* v. *Superior Court* (1985) 39 Cal.3d 633, 638 [217 Cal.Rptr. 238, 703 P.2d 1131].)

Vehicle license fees and use taxes are excise taxes (*Piazza Properties, Ltd.* v. *Department of Motor Vehicles* (1977) 71 Cal.App.3d 622, 628 [138 Cal.Rptr. 357]), refunds of which fall within the ambit of article XIII, section 32 of the state Constitution. The Legislature has provided different methods for seeking refunds of vehicle license fees and use taxes. We turn first to the procedure which the Legislature has provided for seeking a refund of vehicle license fees.

Section 10901 states: "Whenever the department [of motor vehicles] erroneously collects any license fee not required to be paid under this part, the amount shall be refunded to the person paying it upon application therefor made within three years after the date of the payment." (See also

Veh. Code, § 42232.) Vehicle Code section 42231 provides: *"[T]he person who has paid the erroneous or excessive fee or penalty, or his agent on his behalf,* may apply for and receive a refund of the amount thereof as provided in this article . . . ." (Italics added.) "The legislative plan requires the filing of an application for refund as a condition precedent to the existence of liability upon which, after administrative remedies are exhausted, an action may be brought." (*Piazza Properties, Ltd.* v. *Department of Motor Vehicles, supra,* 71 Cal.App.3d 622, 628, *State Bd. of Equalization* v. *Superior Court, supra,* 39 Cal.3d 633, 638.)

The Legislature, therefore, has required that a claim for a refund of vehicle license fees must be filed by *"the person* who has paid the erroneous or excessive fee or penalty, *or his agent on his behalf.*" (Veh. Code § 42231, italics added.) Within the context of this statute, the term "person" does not include a class, and a class representative who files a claim on behalf of all others similarly situated, without the knowledge or consent of such other persons, is not the agent of the members of the class. (Civ. Code, §§ 2299, 2300; 2 Witkin, Summary of Cal. Law (9th ed. 1987) Agency & Employment, §§ 36-40, pp. 49-52.) Accordingly, a class claim for refunds of vehicle license fees, such as the one here at issue, is not authorized by statute.[24]

 We now examine the method which the Legislature has provided for seeking a refund of use taxes. Section 6901 et seq. governs claims for refunds of sales and use taxes. Sections 6902, subdivision (a), 6905, and 6932 provide that unless a claim for refund is filed within three years of the overpayment, no suit may be brought. (*Philips & Ober Electric Co.* v. *State Bd. of Equalization* (1991) 231 Cal.App.3d 723, 728 [282 Cal.Rptr. 338].) These statutes do not, however, address who may file such a claim or whether a class claim may be filed.

An examination of the entire statutory scheme that governed requests for refunds of sales and use taxes when Woosley's claim was filed in 1977 reveals, however, that class claims were not contemplated. If the SBE denied a claim, that entity was required, within 30 days, to "serve notice of its action on the claimant in the manner prescribed for service of notice of a deficiency determination." (§ 6906.) Section 6486, in turn, provided in 1977

---

[24]A substantial number of other states, with similarly worded tax-refund statutes, have concluded that class-refund claims are not permitted under their statutory schemes. (See, e.g., *Henderson* v. *Carter* (1972) 229 Ga. 876 [195 S.E.2d 4, 6]; *Hooks* v. *Comptroller of Treasury* (1972) 265 Md. 380 [289 A.2d 332, 333-334]; *Charles* v. *Spradling* (Mo. 1975) 524 S.W.2d 820, 823-824; *State* ex rel. *Sampson* v. *Kenny* (1970) 185 Neb. 230 [175 N.W.2d 5, 6-7]; *Bailey* v. *State* (N.C. 1991) 412 S.E.2d 295, 300-303; *Lick* v. *Dahl* (S.D. 1979) 285 N.W.2d 594, 599-600.)

that the SBE shall give written notice of a deficiency determination "to the retailer or person storing, using, or consuming tangible personal property," either by mail or by "delivering it to the person to be served." The language of section 6486 suggests that notice must be given to each individual taxpayer. No mention is made of notice to a class representative. The requirement that notice of the denial of a claim must be given to each individual taxpayer thus is inconsistent with the use of a class claim.

When Woosley filed his claim in 1977, section 6904 read: "Every claim shall be in writing and shall state the specific grounds upon which the claim is founded." In 1987, approximately 10 years after Woosley filed his claim, the Legislature amended section 6904 to add the following language as subdivision (b): "A claim filed for or on behalf of a class of taxpayers shall do all of the following: [¶] (1) Be accompanied by written authorization from each taxpayer sought to be included in the class. [¶] (2) Be signed by each taxpayer or taxpayer's authorized representative. [¶] (3) State the specific grounds on which the claim is founded." (Stats. 1987, ch. 38, § 5, p. 101.)

The statute as amended in 1987 expressly permits, for the first time, the filing of a class claim, but requires that each member of the class authorize his or her inclusion in the class and that each member of the class, or the class member's authorized representative, sign the claim. A class claim for refund of sales and use taxes may not be submitted, as it was in the present case, without the knowledge and express consent of each member of the class.

The purpose of this amendment to section 6904, governing claims for refunds of sales and use taxes, was to extend to class claims against the SBE the "written authorization requirements" imposed the year before on class claims for refunds filed with the Franchise Tax Board. (Sen. Com. on Rev. and Tax., Analyses of Measures Heard (1987-1988 Sess.) p. 417.) In 1986, the Legislature had amended section 19055, governing claims for refunds of personal income taxes, and section 26074, governing claims for refunds of bank and corporate taxes, to add language nearly identical to that later added to section 6904. Both the 1987 amendment to section 6904 and the 1986 amendments to sections 19055 and 26074 were intended to spare the state the substantial administrative costs associated with identifying and notifying class members once a case had been certified as a class action. (Sen. Com. on Rev. and Tax., Analyses of Measures Heard, *supra*, p. 417.)

Counsel for the class asserts in its brief that the amendments to sections 6904, 19055, and 26074 demonstrate "that class claims . . . were

proper *prior to* the enactment of the amendments." (Italics in original.) We disagree. The circumstance that, in amending sections 6904, 19055, and 26074, the Legislature chose to allow a narrowly circumscribed form of class claims, does not demonstrate that it previously had authorized a more expansive type of class claim.

As explained above, we conclude that prior to the 1986 and 1987 amendments, class claims seeking tax refunds were not statutorily authorized. The Court of Appeal, however, had upheld the filing of such class claims. (*Schoderbek* v. *Carlson, supra,* 113 Cal.App.3d 1029, 1033; *Lattin* v. *Franchise Tax Board, supra,* 75 Cal.App.3d 377, 381; *Santa Barbara Optical Co.* v. *State Bd. of Equalization, supra,* 47 Cal.App.3d 244, 249; see also *Javor* v. *State Bd. of Equalization, supra,* 73 Cal.App.3d 939, 948.) The Legislature's response to these judicial decisions reveals no more than a desire to avoid the adverse consequences of the filing of class claims for tax refunds, and does not demonstrate that the Legislature previously had intended to authorize the filing of such class claims.

Nothing in the 1987 amendment to section 6904 indicates an intent to permit the filing of a class claim of the type here at issue, nor an acknowledgement by the Legislature that such claims previously had been permitted. Had the Legislature amended section 6904 by explicitly prohibiting the filing of all class claims, we would not infer that the Legislature intended to suggest that previously such claims had been permitted. Here, the Legislature prohibited the type of class claim filed by Woosley. The Legislature permitted only those class claims where each member of the class expressly authorizes and signs the claim. Prior to the 1986 and 1987 amendments, the Legislature had been silent on the subject of class claims seeking refunds of use taxes. This silence did not constitute legislative authorization of such class claims.

In sum, article XIII, section 32, of the California Constitution precludes this court from expanding the methods for seeking tax refunds expressly provided by the Legislature. Prior to the 1987 amendment to section 6904, the Legislature had not authorized class claims for refunds of use (and sales) taxes. Accordingly, class claims seeking such refunds were not permitted prior to the effective date of the 1987 amendment. We disapprove the decisions in *Schoderbek* v. *Carlson, supra,* 113 Cal.App.3d 1029; *Lattin* v. *Franchise Tax Board, supra,* 75 Cal.App.3d 377; *Javor* v. *State Bd. of Equalization, supra,* 73 Cal.App.3d 939, and *Santa Barbara Optical Co.* v. *State Bd. of Equalization, supra,* 47 Cal.App.3d 244, to the extent they express views to the contrary.

Citing the decision in *American Pipe & Construction Co.* v. *Utah* (1974) 414 U.S. 538 [38 L.Ed.2d 713, 94 S.Ct. 756] (hereafter, *American Pipe*),

plaintiff contends that "the claims of all of the class members have been tolled during the pendency of the instant action," and that if we disallow Woosley's class claim, "notice would have to be given to each putative class member that (1) they were entitled to a refund of use taxes and license fees, and (2) the time to file a claim for refund was running from the date of notice."

We need not, and do not, decide plaintiff's first contention that "the claims of all of the class members have been tolled during the pendency of the instant action" because that issue affects only those persons who did not file valid claims and who, therefore, are not included in the present class. "The well-established rule is that we should avoid advisory opinions. [Citation.]" (*Neary* v. *Regents of University of California* (1992) 3 Cal.4th 273, 284 [10 Cal.Rptr.2d 859, 834 P.2d 119]; *State* v. *State Tax Com'n of Missouri* (Mo. 1983) 651 S.W.2d 130, 133.)

We do reach plaintiff's second contention, that if we disallow Woosley's class claim, "notice would have to be given to each putative class member that (1) they were entitled to a refund of use taxes and license fees, and (2) the time to file a claim for refund was running from the date of notice," because this issue affects the parties before the court in that the burden of providing notice would be borne by the parties. We disagree, however, with plaintiff's contention that such notice is required.

Whatever merit there may be in plaintiff's argument that the time for putative class members to file claims has been tolled, we are unaware of any requirement that notice be given to persons affected by such tolling of the period in which to file a claim. The decision in *American Pipe* required only that persons who will be included in the class be notified so that they have an opportunity to opt out of the class and thus not be bound by the resulting judgment. Neither the decision in *American Pipe, supra,* 414 U.S. 538, nor any other authority of which we are aware, requires that persons who are outside the class be notified of that fact.

Plaintiff further contends that any decision holding that class claims seeking tax refunds may not be filed, should be applied prospectively only, because potential claimants reasonably relied upon decisions of the Courts of Appeal which reached a contrary conclusion.

"The general rule that judicial decisions are given retroactive effect is basic in our legal tradition." (*Newman* v. *Emerson Radio Corp.* (1989) 48 Cal.3d 973, 978 [258 Cal.Rptr. 592, 772 P.2d 1059].) We have stressed that although this rule of retroactivity "has not been an absolute one" (*id.* at p.

979), exceptions are limited. The circumstance that our decision overrules prior decisions of the Courts of Appeal does not in itself justify prospective application. (*Id.* at p. 986.)

"To determine whether a decision should be given retroactive effect, the California courts first undertake a threshold inquiry: does the decision establish a new rule of law? If it does, the new rule may or may not be retroactive . . . ; but if it does not, 'no question of retroactivity arises,' because there is no material change in the law. [Citations.]" (*People* v. *Guerra* (1984) 37 Cal.3d 385, 399 [208 Cal.Rptr. 162, 690 P.2d 635].) An example of a decision which does not establish a new rule of law is one in which we give effect "to a statutory rule that the courts had theretofore misconstrued (*People* v. *Mutch* (1971) 4 Cal.3d 389, 394) . . . ." (*Id.* at p. 399, fn. 13; *McManigal* v. *City of Seal Beach* (1985) 166 Cal.App.3d 975, 981-982 [212 Cal.Rptr. 733].) "Whenever a decision undertakes to vindicate the original meaning of an enactment, putting into effect the policy intended from its inception, retroactive application is essential to accomplish that aim. [Citation.]" (*People* v. *Garcia* (1984) 36 Cal.3d 539, 549 [205 Cal.Rptr. 265, 684 P.2d 826].) Accordingly, we conclude that our holding that the Legislature had not authorized, at the time here in question, the filing of class claims seeking refunds of vehicle-license fees and use taxes, should be applied retroactively.

■ Plaintiff and amicus curiae, Association of California Car Clubs, point out that the parties stipulated in the trial court "that the Court's determination on liability shall bind defendants as to all prospective class members that may be defined by order of Court entered subsequent to the determination of liability," and argue that this stipulation binds the state to provide relief to all members of the class as defined in Woosley's class claim. We do not read this stipulation so broadly.

The apparent purpose of the stipulation was to allow the court to determine the liability issues before deciding whether to certify the case as a class action. The parties stipulated that the determination of liability issues would bind all members of the class as "may be defined by order of Court." This agreement is not inconsistent with a subsequent ruling that the class includes only those persons who have timely filed valid claims. In the event the class as defined is not numerous enough to justify a class action, the stipulation does not mandate that a class be certified.

## CONCLUSION

We hold the state violated the commerce clause of the United States Constitution by charging vehicle license fees for vehicles originally sold

outside California, and use taxes for vehicles purchased from private parties outside California, that were higher than the fees and taxes charged on similar vehicles first sold within California. We also hold that even if the DMV violated the California Administrative Procedure Act (Gov. Code, § 11340 et seq.) when, in November 1976, it altered its practice regarding the collection of use taxes, the proper remedy for such a violation does not encompass a refund of taxes properly due under state law. Lastly, we hold the class claim filed by Woosley was not authorized by statute and thus the class on whose behalf the action is maintained may include only those persons who timely filed valid claims for refund.

Accordingly, we affirm the decision of the Court of Appeal to the extent it holds that the DMV violated the commerce clause of the federal Constitution by imposing higher license fees on vehicles originally purchased in other states and higher use taxes for vehicles purchased from private parties outside California. We reverse the decision of the Court of Appeal to the extent it holds that persons who paid use taxes after November 1976, based on the actual cost of a vehicle, are entitled to refunds (because in November 1976 the DMV ceased its discriminatory practice and began to collect use taxes on all vehicles on this basis).

The cause is remanded for further proceedings consistent with our opinion. In light of our holding, the Court of Appeal shall direct the trial court to amend the description of the class (1) to add to the class those persons who paid higher fees and taxes because of the DMV's application of section 10753.2's depreciation schedule in a fashion different for vehicles originally purchased outside California (see fn. 15, *ante*, at p. 774), (2) to delete from the class those persons who paid use taxes after November 1976 (when the DMV ceased its discriminatory practice) based on the actual cost of a vehicle, (3) to delete from the class those persons who paid use taxes on vehicles purchased outside the state from a manufacturer or dealer (because the use tax collected in those circumstances equalled the sales tax collected when a similar vehicle was purchased from a manufacturer or dealer in California), and (4) to delete from the class those persons who have not timely filed a valid claim for a refund. The trial court then shall determine whether, as so defined, an ascertainable class exists for purposes of a class action. Because our opinion will result in a substantial reduction in the amount of the judgment, the trial court shall reconsider the amount of its award of attorney fees to counsel for the class and the amount of its award to Woosley "as fees for services rendered as class representative."[25] The parties shall bear their own costs incurred before this court.

---

[25]Because the parties neither have briefed nor argued the issue, we do not review, and thus leave unchanged, that portion of the decision of the Court of Appeal directing the trial court

Mosk, Acting C. J., Panelli, J., Arabian, J., Baxter, J., Strankman, J.,* and Sills, J.,† concurred.

The petition of appellant Charles Patrick Woosley for a rehearing was denied December 31, 1992, and the opinion was modified to read as printed above. Lucas, C. J., and Kennard, J., did not participate therein.

---

on remand to reconsider whether Woosley is entitled to an award of fees for the legal services he provided in connection with this matter.

*Presiding Justice, Court of Appeal, First Appellate District, Division One, assigned by the Chairperson of the Judicial Council.

†Presiding Justice, Court of Appeal, Fourth Appellate District, Division Three, assigned by the Chairperson of the Judicial Council.