[No. G029383. Fourth Dist., Div. Three. Nov. 6, 2002.]

WILLIAM BUNKER, Plaintiff and Appellant, v.
COUNTY OF ORANGE et al., Defendants and Respondents.

**COUNSEL**

Murphy Sheneman Julian & Rogers, Robert A. Julian, Michael A. Sweet; Cotchett, Pitre & Simon and Bruce Simon for Plaintiff and Appellant.

Benjamin P. de Mayo, County Counsel, Della M. Welch, Nicole A. Sims and Marianne Van Riper, Deputy County Counsel, for Defendants and Respondents.

## OPINION

SILLS, P. J.—A classic error in debate is attacking something that your opponent hasn't said. (E.g., "Unlike my opponent Smerdley, I am in favor of the minimum wage" where poor old Smerdley has never said anything against the minimum wage.) In the case before us, the County of Orange has done a magnificent job of showing that the plaintiff cannot get relief that his complaint doesn't actually seek. Like a dog with a chew toy, the county has shredded the notion one can bring a class claim for a property tax refund.

The only problem is, it's somebody else's chew toy, not the plaintiff's. This action is not, contrary to what we are told throughout the county's respondent's brief, a "class claim for a property tax refund." No refund claims will be adjudicated in this lawsuit, nor will this action itself require any refund checks being issued. *This* action will, at the most, merely result in an order requiring the county to do what the Legislature has already said it must do automatically, which is to send out notices to certain taxpayers when the county has failed for more than two years to make a final determination on their petitions for reassessment. Any refunds that occur as a result of this litigation will happen after it is concluded, when individuals file claims in the wake of those notices (and, maybe, thereafter file litigation on denied claims). Accordingly, we reverse the trial court's judgment of dismissal which was predicated on the theory that this is a lawsuit making a "class claim" for tax refunds.

### I. *Background*

Property values in Orange County plummeted in the early and middle 1990's. For a while, however, the Orange County Assessor's Office chose to continue assessing at least some property as if the inflation of the 1980's was still steaming along. The case of William Bunker, a homeowner in San Juan Capistrano, is typical: In 1992, just as local property values were nose-diving, the assessor's office assessed his home for the 1992-1993 tax year at $940,221. Bunker, however, thought he had recently lost more than $160,000 in equity in the property, and on September 6, 1992, filed a formal request to have the property revalued at $770,000. The assessment appeals board, for reasons that are irrelevant to this appeal, did not make a final determination of Bunker's application for reduction in assessment until

November 1994, when it sustained the assessor's valuation. By December the county was in bankruptcy.

The belatedness of the assessment appeals board's final determination is the core of the case before us now. The Legislature has enacted a statute, Revenue and Taxation Code section 1604,[1] which provides that if a county assessment appeals board does not make a final determination on the application for reduction in assessment within two years of the timely filing of the application, the *taxpayer's* opinion of the market value of the property "shall be the value upon which taxes are to be levied for the tax year covered by the application." The taxpayer's value is to be "placed on the assessment roll," and is to remain there until the assessment appeals board finally does get around to making a "final determination on the application."

Bunker had paid his property taxes based on the assessed higher value, and 13 months after the assessment appeals board had sided with the assessor, Bunker filed a claim for property tax refund on behalf of himself and all "other similarly situated taxpayers" to recoup property tax overpayments for the 1992-1993 and 1993-1994 tax years.

Meanwhile, in late 1996, Bunker obtained permission from the bankruptcy court to proceed with his property tax refund claim "under applicable nonbankruptcy law." Bunker filed this class action in March 1998, seeking a writ of mandate to force Orange County to comply with section 1604.

Essentially, Bunker has alleged that the county deliberately covered up, in the shadow of its impending bankruptcy, the legal consequences of its delays in acting on applications for reduction in assessment in some 1,500 cases. Indeed, the assessment appeals board has been alleged to have acted with the most profound cynicism. The complaint alleges that the county immediately caved in to those few taxpayers who understood their rights under section 1604. As to the others, the county deliberately did not comply with section 1604, hoping to reap a windfall because of their ignorance.

## II. *Procedural History*

Judge Tully Seymour overruled the county's demurrer to the original complaint, saying that he couldn't "think of neater fact situation" more appropriate to a "writ-class action type of context." However, after finishing discovery in 2000, Bunker sought to amend the complaint by adding another tax year, 1993-1994. By then the case had been reassigned to Judge Stuart Waldrip, who *sustained* a demurrer and granted the county's motion to strike

---

[1]All statutory references in this opinion are to the Revenue and Taxation Code.

the class action allegations, but gave Bunker unqualified leave to amend. Bunker filed a third amended complaint, and the county refiled its demurrer and motion to strike the class action allegations. With Judge Waldrip's retirement a new judge was assigned to the case, Judge John C. Woolley. Judge Woolley sustained the demurrer and granted the county's motion to strike, with leave to amend for Bunker to file as an individual. Bunker stipulated to abandoning his individual claim except insofar as it supported a right to proceed with this action as a class action, allowing the court to enter a judgment pursuant to the stipulation based on the sustained demurrer and motion to strike. This appeal followed.

### III. *The Plaintiff's Legal Theory*

The problem that bedeviled Judge Woolley at the oral argument was what precise relief Bunker's third amended complaint really seeks. To the county, his complaint was simply a class action seeking tax refunds for members of a class, and therefore barred by *Woosley v. State of California* (1992) 3 Cal.4th 758 [13 Cal.Rptr.2d 30, 838 P.2d 758]. If the county's characterization is true, then this is an easy case and the trial court (or at least two-thirds of it, i.e., Judges Waldrip and Woolley, but not Seymour) was correct.

It isn't. But to understand what Bunker is seeking, a detailed analysis of section 1604 is necessary first, if only because of the counterintuitive nature of the statute. It is one of the most remarkable statutes in all tax law. It penalizes the tax *collector*, not the *taxpayer*, for failing to meet a deadline. Wow. That's something you do not see everyday. What's more, the Legislature put some teeth into the statute: It requires the county to formally *notify* the taxpayer in writing of the consequences of the county's delay.

Section 1604 begins with two subdivisions which set up the requirement for county assessment appeals boards to meet to establish the value of property for property tax purposes: "(a) In counties of the first class, annually, on the fourth Monday in September, the county board shall meet to equalize the assessment of property on the local roll. The board shall continue to meet for that purpose, from time to time, until the business of equalization is disposed of. [¶] (b) In all other counties, annually, on the third Monday in July, the county board shall meet to equalize the assessment of property on the local roll. It shall continue to meet for that purpose, from time to time, until the business of equalization is disposed of."

After these two subdivisions come two unsubdivided paragraphs which allow, with exceptions not applicable to this case, taxpayers to file petitions for reductions in the assessed values of their property: "Any taxpayer may

petition the board for a reduction in an assessment and a proportionate reduction or refund of the taxes extended thereon by filing an application pursuant to Section 1603 or Section 5097. [¶] The county board shall have no power to receive or hear any petition for a reduction in an escaped assessment made pursuant to Section 531.1 nor a penal assessment levied in respect thereto, nor to reduce those assessments."

The next portion of the statute contains a real whammy for the counties if they delay in acting on petitions for reassessment. If a county doesn't act on the taxpayers' petition within two years, it is the *taxpayer's* opinion of value that becomes the operative value: "(c) If the county assessment appeals board fails to hear evidence and fails to make a final determination on the application for reduction in assessment of property within two years of the timely filing of the application, *the taxpayer's opinion of market value as reflected on the application for reduction in assessment shall be the value upon which taxes are to be levied for the tax year covered by the application*, unless either of the following occurs: [¶] (1) The taxpayer and the county assessment appeals board mutually agree in writing, or on the record, to an extension of time for the hearing. [¶] (2) The application for reduction is consolidated for hearing with another application by the same taxpayer with respect to which an extension of time for the hearing has been granted pursuant to paragraph (1). In no case shall the application be consolidated without the taxpayer's written agreement after the two-year time period has passed or after an extension of the two-year time period previously agreed to by the taxpayer has expired." (Italics added.)

The text of section 1604, subdivision (c) doesn't even have a provision that the taxpayer's own opinion of value be in good faith or reasonable, and in fact it *can* result in artificially low values being inserted onto the assessment rolls. (E.g., *Mission Housing Development Co. v. City and County of San Francisco* (2000) 81 Cal.App.4th 522, 526 [97 Cal.Rptr.2d 8] [noting that earlier litigation based on § 1604 resulted in what property owners had eventually conceded were "artificially low values for their property" being inserted on the assessment rolls].)

Next under subdivision (c)(2) of section 1604 is an unnumbered paragraph which adds a few qualifications to the implementation of the requirement of adoption of the taxpayer's value. The two years is dated from the close of the filing period (giving the county a little more time until the reduction must be made), and exempts the county from having to make the reduction at all where the taxpayer failed to give "full and complete information as required by law" or where there is litigation directly relating to the issues involved in the taxpayer's application, such as, presumably, litigation relating the current value of the property: "The reduction in assessment reflecting

the taxpayer's opinion of market value shall not be made, however, until two years after the close of the filing period during which the timely application was filed. Further, this subdivision shall not apply to applications for reductions in assessments of property where the taxpayer has failed to provide full and complete information as required by law or where litigation is pending directly relating to the issues involved in the application. This subdivision is only applicable to applications filed on or after January 1, 1983."

When the county has been stuck with the taxpayer's valuation in subdivision (c) if it doesn't act in two years, subdivision (d) limits the damage. The taxpayer's value remains on the roll only until the county finally does make a final determination of the property's value: "(d) If, *pursuant to subdivision (c), the applicant's opinion of value has been placed on the assessment roll, that value shall remain on the roll until the county board makes a final determination on the application.* The value so determined by the county board, plus appropriate adjustments for the inflation factor, shall be entered on the assessment roll for the fiscal year in which the value is determined. No increased or escape taxes other than those required by a purchase, change in ownership, or new construction, or resulting from application of the inflation factor to the applicant's opinion of value shall be levied for the tax years during which the county board failed to act." (§ 1604, italics added.)

The enforcement mechanism for the statute is in the final subdivision (e). The county is required to *notify* applicants "of any decision . . . not to hold a hearing," and, more pointedly, that as "a result of the county board's failure to hold a hearing within the prescribed time" it is the taxpayer's opinion of value which is the value for property tax purposes: "(e) The county board shall notify the applicant in writing of any decision by that board not to hold a hearing on his or her application for reduction in assessment within the two-year period specified in subdivision (c). This notice shall also inform the applicant that the taxpayer's opinion of value as reflected on the application for reduction in assessment shall, as a result of the county board's failure to hold a hearing within the prescribed time period, be the value upon which taxes are to be levied in the absence of the application of either paragraph (1) or (2) of subdivision (c)." (§ 1604.)

At this point we need to make two observations. First, the phrase "decision . . . not to hold a hearing" in section 1604, subdivision (e) obviously does not relieve a county when the failure to make a final determination on an application for reduction in two years is more the result of simple "didn't-get-around-to-it"-ism or press of business rather than a conscious decision not to hold a hearing. (In any event, since this case comes to us

from a successful demurrer, Bunker would get the benefit of the doubt on the factual issue of whether the county deliberately decided to avoid hearings for the 1,500 petitions which form the class in this class action.) The phrase "failure to hold a hearing within the prescribed time period" is used synonymously with "decision . . . not to hold a hearing," and signals a broad reading of the word "decision," as in "Doing nothing is also a decision, too."

The second observation is that section 1604, subdivision (d) indicates that when the county misses the two-year deadline, it affects not only the tax, but the formal assessment roll as well. That is, subdivision (c) affects the *amount* that a taxpayer is legally obligated to *pay* when the county misses the deadline. But subdivision (d) further says that the taxpayer's *value* shall be *reflected on the tax roll*. (It "shall be *the value* upon which taxes are to be levied for the tax year covered by the application" (§ 1604, subd. (d), italics added).)

The reflection on the roll pursuant to section 1604, subdivision (d) is important, because of another statute, section 2635, which triggers *another* required notice when a taxpayer has paid more taxes than he or she should pay as reflected on the assessment roll. In its entirety section 2635 states: "When the amount of taxes paid exceeds the amount due by more than ten dollars ($10), the tax collector shall send notice of the overpayment to the taxpayer. The notice shall be mailed to the taxpayer's last known address and shall state the amount of overpayment and that a refund claim may be filed pursuant to Chapter 5 (commencing with Section 5096) of Part 9."

Section 2635 is significant to Bunker's theory, because it furnishes the link between the operation of section 1604 and something that actually might one day result in a check being written by the county to an individual taxpayer. Bunker's basic legal theory goes like this: Taxpayers who filed timely petitions for a downward reassessment of their property and whose petitions were not finally determined in two years were *entitled*, under section 1604, subdivision (c) to two things: (1) to have to pay taxes only on the lower amount reflected by their opinion of value in their reassessment petition, and (2) to have the property tax assessment rolls reflect that value as well.

Thus, were the county to be compelled to comply with section 1604, *two* sets of notices would go out. One, required by subdivision (e), would tell the taxpayer that the taxpayer's opinion of value is now "the value upon which taxes are to be levied." But the second, pursuant to section 2635, would tell taxpayers (at least those whose opinions of value meant more than a $10 difference) that they had overpaid their taxes and could *now* file refund claims.

## IV. *The Precise Relief Sought by the Complaint*

What exactly does the third amended complaint seek? Much of the document does not read like a complaint at all, but as points and authorities masquerading as a complaint. (E.g., pars. 15 and 16: "The two-year rule is hard, fast, and unforgiving. As the Court of Appeal stated . . . . The two-year sanction has far reaching consequences. If the county board fails to finally determine the application within the two-year period, the board loses all jurisdiction to do anything other than adopt the taxpayer's valuation.") The topic headings in the complaint keep up the same feisty rhetorical style. The so-called "statement of facts" is essentially a set of assertions of law. (E.g., "The Administrative Procedures Do Not Remedy a Two-Year Rule Violation" and "A Class Action is the Only Method to Protect Uninformed Taxpayers.")

But when one examines precisely what Bunker is asking for, the relief requested turns out to be rather modest. There are three causes of action: (a) declaratory relief, (b) writ of mandate, and (c) a "taxpayer action to compel compliance with California law." Under the first cause of action for declaratory relief, Bunker asks for a declaration "that the County has an immediate and mandatory responsibility to correct its approach under section 1604 and to adopt valuations set forth in the subject applications [the 1,500] retroactively to the tax year for which a Class Member made a timely application."

The cause of action for writ of mandate seeks an order directing the county and its tax collector "to comply with their respective duties under sections 1604 and 2635, and as a part of the correction process, to adopt valuations set forth in the Class applications for all purposes described in section 1604 and send the notices required by section 1604(e) and 2635."[2]

The third cause of action is a taxpayers' action seeking an "order restraining Orange County from continuing its unlawful course of conduct and directing the County to comply with section 1604(c) and (d) of the Code."

## V. *This Is Not a Tax Refund Case After All*

The county relies mainly on *Woosley v. State of California, supra,* 3 Cal.4th 758. But *Woosley* cannot be read, as the county tends to do, for the

[2]Subdivision (e) was not added to section 1604 until 1995. In this appeal from a judgment after a sustained demurrer on the ground that the case is an impermissible class claim for a property tax refund, the county has not briefed the question of whether an order requiring compliance with section 1604, subdivision (e) might somehow constitute the retroactive application of the statute. We do not need to deal with the issue in this appeal, which can await further proceedings in the trial court.

inartfully overbroad proposition that any case that might even eventually *lead* to someone receiving a tax refund can *never* be framed as a class action. In *Woosley*, the Department of Motor Vehicles discriminated against cars purchased out of state by charging their owners higher registration fees and use taxes. The owner of a 1936 supercharged Auburn speedster purchased in North Carolina made a class claim for refunds, assuming that the differential was held (as it indeed was) to be unconstitutional under the federal commerce clause.

Among many other things, the high court said the class "claim" could not go forward (only an individual claim could) because it was "not authorized by the statutes governing claims for refunds of vehicle license fees and use taxes." (*Woosley v. State of California, supra,* 3 Cal.4th at p. 788.) Most of the court's opinion on the point is taken up with a discussion on the statutory procedure for seeking refunds of vehicle license fees and use taxes. (See *id.* at pp. 789-792.) That procedure simply didn't contemplate "class claims," and the California Constitution (art. XIII, § 32) precluded the court from "expanding the methods for seeking tax refunds" beyond those "expressly provided by the Legislature." (*Woosley*, at p. 792.)

In contrast with *Woosley*, Bunker's case is not a "class claim for tax refund" or a "review of tax proceedings."[3] Any tax refund *claims* will come later, and will not come as a "class claim" but will have to be filed individually. All Bunker is asking for *now* is a court order requiring the county to comply with sections 1604 and 2635. That is, if Bunker were to receive the relief he requests, there will be, in addition to a simple declaration as to the effects of sections 1604 and 2635, an order to the effect that the county is obligated by law to send out two notices. Not write any checks.

In fact, it is theoretically possible that Bunker could receive all the relief he has asked for in his complaint and the county might never write a refund check. After all, taxpayers who will receive the notices of overpayment pursuant to section 2635 will only be informed "that a refund claim *may* be filed." (Italics added.)

A case relied on by the county, *Mission Housing Development Co. v. City and County of San Francisco, supra,* 81 Cal.App.4th 522 (*Mission Housing II*), ironically illustrates the fact that section 1604 is preliminary to any tax refund claims. There, the owners of some low-income housing projects in San Francisco filed applications for reduction in assessed values, listing what they would eventually concede were "artificially low" values for their property. (*Mission Housing II*, at p. 526.) The assessment appeals board

---

[3]For example, the respondent's brief says that the third amended complaint "seeks to compel the County to pay a tax refund to all members of a *class* of taxpayers." That may be Bunker's "true objective," but that is not what his complaint requests by way of relief.

failed to make a final determination of their petitions within two years and later an appellate court would conclude that it was "inescapable" that the taxpayers' opinions of value should be the values upon which the property taxes should be levied. (*Mission Housing Development Co. v. City and County of San Francisco* (1997) 59 Cal.App.4th 55, 76 [69 Cal.Rptr.2d 185] (*Mission Housing I*).)

However, during the course of presenting their *claim* (unlike the 1,500 members of the class here, the taxpayers in *Mission Housing* knew they had to make a claim for a tax refund), the taxpayers had amended their opinions of value to somewhat more reasonable levels than in their original applications. On remand, the trial court had to decide how much the refund would be: Would it be based on the original lowball opinions of value or the more reasonable opinions of value presented in the claim process? The trial court decided the refund should be based on the original opinions of value, but when the case came to the appellate court for the second time, the appellate court rejected the trial court's approach, reasoning that any lawsuit to collect a refund may only recover the amount submitted in a claim for a refund. (See *Mission Housing II, supra*, 81 Cal.App.4th at pp. 526-527.) The point is that there first must be a *claim* for a refund before there can be litigation for it, which is simple exhaustion of remedies.

It is premature to opine now on whether any tax refund claims that might eventually be precipitated by the notices which this lawsuit may generate will have to be paid. However, our conclusion as to the nature of the suit disposes of most of the county's arguments on appeal. Those arguments are all predicated on the idea that the suit seeks a direct refund, not just an invitation to file a claim. Thus when the county says that none of the class members have exhausted their administrative remedies, it is a wholly irrelevant point. Given the nature of the relief sought, one would expect class members *not* to have exhausted any administrative remedies (e.g., having already filed claims for tax refunds) because members of the class were unlawfully denied notice of their opportunity to file individual refund claims when the county missed the two-year deadline. And when the county says that the members of the class are not entitled to "automatic tax refunds," that is true, but likewise irrelevant. We are concerned with whether section 1604 may be enforced by a writ, not whether members of the class may now obtain refunds of overpaid taxes.

The county's statute of limitations argument is particularly off point, and relies on the technique of citing a statute for a proposition that it doesn't stand for. (The giveaway is the absence of a quotation of the text.) Here is what the county argues: Section 5141, subdivision (a) "provides"—we are quoting the county's brief now, not the statue—"that all claims for refunds

must be filed within six months after the claim was rejected by the board of supervisors." Then the county says that "[a] claim will be considered rejected if no notice of action on the claim was mailed within six months," for which it cites section 5141, subdivision (b). From these premises, the county argues that Bunker filed a class claim with the board of supervisors on or about December 1, 1995; it was "deemed denied by operation of law" six months later, or June 1996; and therefore the lawsuit, commenced in March 1998, was too late.

Now here is what the statutes actually say. Section 5141, subdivision (a) provides: "An action under this article, except an action brought under Section 5148, shall be commenced within six months from and after the date that the board of supervisors or city council rejects a claim for refund in whole or in part." The statute is obviously talking about a *civil suit* for a refund.

Section 5141, subdivision (b), which the county in its brief says stands for the proposition "[a] claim will be considered rejected if no notice of action on the claim was mailed within six months" really says: "Except as provided in subdivision (c), if the board of supervisors or city council fails to mail notice of its action on a claim for refund within six months after the claim is filed, the claimant *may*, prior to mailing of notice by the board of supervisors or city council on the claim, *consider the claim rejected and bring an action under this article.*" (Italics added.) The statute is plainly permissive, with the implication that the six months of section 5141, subdivision (a), *doesn't* start running on a claim for refund after six months of inaction. It is most certainly not the automatic trigger that the county asserts it is.

Now let's look at section 5141, subdivision (c), which is an exception to subdivision (b). It says: "If an applicant for the reduction in an assessment states in the application that the application is intended to constitute a claim for a refund pursuant to Section 5097, the claim for refund shall be deemed denied on the date the final installment of the taxes extended on such assessment becomes delinquent or *on the date the equalization board makes its final determination on the application, whichever is later.*" (Italics added.)

The third amended complaint alleges that the county had never made a "final determination" on the applications of the 1,500 taxpayers, and therefore we must accept that allegation as true for purposes of this appeal. Under section 5141, subdivision (c), they can still make refund claims.

The requirements of making a refund claim are found in section 5097, subdivision (a). The statute provides: "No order for a refund under this article shall be made, except on a claim: [¶] (1) Verified by the person who paid the tax, his or her guardian, executor, or administrator. [¶] (2) Filed

within four years after making of the payment sought to be refunded or *within one year after the mailing of notice as prescribed in Section 2635,* or the period agreed to as provided in Section 532.1, *whichever is later."* (Italics added.)

True, this statute would, on its face, preclude "class claims" because refund claims must be "[v]erified by the person who paid the tax."[4] ▪ But it also means that individuals who have *never received* the "mailing of notice as prescribed in Section 2635" are not yet precluded from making a claim for refund. The statute thus creates an elegant equipoise: If the county delays and *never* gets around to making a final determination of an application for reassessment, and therefore a section 2635 notice is never mailed, the statute of limitations on making a refund claim never runs. The county's delay becomes its own punishment.

(Indeed, the subject of whether property tax refund claims can ever be made after four years is apparently the source of some controversy between some counties and the State Controller's Office. In May 2001 the State Controller's Office issued a legal opinion letter to the effect "that a county is required to allow a taxpayer's refund claim within one year following the mailing of the notice of overpayment (under Revenue and Taxation Code section 2635), even though the overpayment corresponds to an assessment year beyond four years." The county strenuously opposes Bunker's request that we take judicial notice of the State Controller's opinion (and also a State Controller's Tax Collectors' Reference Manual reflecting the same position), arguing that it doesn't aid the interpretation of the statute, and merely reflects the opinion of the author. We grant Bunker's request. Not to do so would be a little bit like refusing to read a treatise or law review article that could shed light on the legal issues in a case merely because the treatise or law review article reflected the author's own view. The court already knows that. Then again, the relevance is largely academic: The main significance of the State Controller's letter and the manual is that the State Controller, like this court, can read the plain language of § 5097 and draw the obvious conclusion.)

---

[4]Bunker was apparently given express authorization from the bankruptcy court to file a "class claim" in December 1995. The question of whether that bankruptcy court authorization might allow taxpayers in the class of 1,500 other than Bunker to say that Bunker's 1995 claim was their claim is not before us—this lawsuit is not about the processing of claims. However, the plain language of the state law would preclude taxpayers other than Bunker from trying to piggyback onto the 1995 class claim on any basis other than federal law. The issue is probably academic in any event because section 2635 means that there would still be time for other taxpayers to present individual claims.

## VI. *Nor Is This a Case to Enjoin the Collection of a Tax*

 Finally, we confront the constitutional and statutory bars against injunctions to enjoin the collection of a tax. Section 4807 is the statutory property tax version of article XIII, section 32 of our state Constitution, both of which bar injunctions against collecting a tax: Section 4807 provides: "No injunction or writ of mandate or other legal or equitable process shall issue in any suit, or proceeding in any court against any county, municipality, or district, or any officer thereof, to prevent or enjoin the collection of property taxes sought to be collected." Article XIII, section 32, is more general: "No legal or equitable process shall issue in any proceeding in any court against this State or any officer thereof to prevent or enjoin the collection of any tax." It then adds this sentence: "After payment of a tax claimed to be illegal, an action may be maintained to recover the tax paid, with interest, in such manner as may be provided by the Legislature." (The constitutional provision has been held to apply *only* to actions against the state; see *Pacific Gas & Electric Co. v. State Bd. of Equalization* (1980) 27 Cal.3d 277, 281, fn. 6 [165 Cal.Rptr. 122, 611 P.2d 463].)

 The fundamental idea of California Constitution, article XIII, section 32, and by extension section 4807, is that you first must pay your taxes— even if the amount you paid was higher than the law required—and *then* sue for a refund. You don't get to seek any injunction against paying them in the first place. The theory is that revenue collection should continue during litigation so that the government can continue to operate. (See *Pacific Gas & Electric Co. v. State Bd. of Equalization, supra,* 27 Cal.3d at p. 283.)

*Pacific Gas & Electric Co. v. State Bd. of Equalization, supra,* 27 Cal.3d 277, illustrates a broad application of the rule against using an injunction to prevent payment of the (arguably illegal) tax in the first place. There, three public utilities filed suit to have the State Board of Equalization (which is the assessing entity for property owned by public utilities) adjust the assessment of their real property back to 1975-1976 levels in accord with Proposition 13. Specifically, the Board of Equalization appraised the property at 1978 levels, the utilities requested a downward adjustment pursuant to Proposition 13's rollback provision, the board refused, and the utilities sued for a rollback, *not yet having paid the tax on the 1978 levels. (Id.* at p. 279.) The Supreme Court held that "on its face" California Constitution, article XIII, section 32 barred the action, noting that "[i]t is certainly true that the assessment of real property is an integral part of the taxing process," hence "a court order invalidating an assessment will in effect 'prevent or enjoin the collection' of the tax." (*Pacific Gas, supra,* 27 Cal.3d at p. 280.)

It should be obvious that the *Pacific Gas* scenario is not like the case before us. Here, unlike in *Pacific Gas, by definition the tax has already been*

*paid.* There will be no notice of overpayment pursuant to section 2635 unless the taxpayer has already forked over the money, some of which he or she is entitled to get back.

The most one can say in regard to the tax injunction argument is that Bunker's claim for current relief—that is, his request that the county stop ignoring section 1604—might benefit taxpayers in future years as well and therefore somehow operate, as in *Pacific Gas,* as a de facto injunction against the "collection" of a tax. But even that doesn't hold up. Recall that section 1604 gives the county *two years* to make a final determination on a reassessment petition. By that time one will have presumably paid one's taxes at the higher level and be in a position to make a refund claim. The suit still will not have prevented or enjoined the "collection" of any property tax.

## VII. *Disposition*

The judgment of dismissal is reversed. Appellant shall recover his costs on appeal.

Rylaarsdam, J., and O'Leary, J., concurred.

A petition for a rehearing was denied December 5, 2002, the opinion was modified to read as printed above.